AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>The Property Located at 43063 Weber City Road,<br>Gonzales, Louisiana 70737 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  22-mj- 15

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT "A"

located in the _____ Middle _____ District of _____ Louisiana _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18  U.S.C. § 371; 18: 2251;<br>18: U.S.C. § 2252 and 2252A;<br>18: U.S.C.§ 2422(b) | Conspiracy to produce, possess, receive, or distribute child pornography, and online enticement of a minor; Sexual exploitation of children; Production, possession, receipt, and distribution of child pornography; and Online enticement of a minor. |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Special Agent Stephanie Bobo, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: ___ 3/11/2022 ___

_____
*Judge's signature*

City and state:  Baton Rouge, Louisiana

Erin Wilder-Doomes, U.S. Magistrate Judge
_____
*Printed name and title*

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

IN THE MATTER OF THE SEARCH OF
THE PROPERTY LOCATED AT:
**43063 WEBER CITY ROAD
GONZALES, LOUISIANA 70737**

Magistrate No. _____22-mj-15_____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A RULE 41 WARRANT TO SEARCH AND SEIZE

    I, Special Agent Stephanie Bobo, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

    1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known located at 43063 Weber City Road, Gonzales, Louisiana, 70737, occupied and controlled by **Hannah KINCHEN ("KINCHEN"),** her husband, B.K., and their two minor children, hereinafter "**SUBJECT PREMISES**," located in Ascension Parish, in the Middle District of Louisiana, as further described in Attachment A, for the things described in Attachment B.

    2.    I am a Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been employed as such since September 2017.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code.

    3.    Throughout my law enforcement career, I have participated in investigations of bank fraud, health care fraud, bankruptcy fraud, public corruption, intellectual property rights, crimes against children, child exploitation, child pornography, and human trafficking.

I am familiar with, and have employed, the investigative techniques used in these investigations, such as the use of cooperating witnesses, confidential informants, interviews, analysis of bank records, consensual recordings, search and seizure warrants, and Title III court authorized wire interceptions.

4.      As an agent, I am authorized to seek and execute arrest, search, and seizure warrants.  I am currently assigned to the Violent Crime Squad in the Baton Rouge Resident Agency, where I investigate matters involving the online exploitation of children, particularly in relation to violations of Title 18, United States Code (U.S.C.), Sections 2251, 2252 and 2252A, and 2422(b), which criminalizes, among other things, the production, possession, receipt, and distribution of child pornography as well as the online enticement of a minor.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from others, including but not limited to civilian witnesses and experts. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 371, Conspiracy, and Sections 2251, 2252 and 2252A and 2422(b), which criminalize, among other things, the sexual exploitation of children, and activities relating to material involving the sexual exploitation of children including the production, possession, receipt, and distribution of child pornography, as well as the online enticement of a minor (collectively,

the **"TARGET OFFENSES"**), have been committed by **KINCHEN**, **Grant DURTSCHI ("DURTSCHI")**, and others known and unknown to law enforcement. There is also probable cause to search the places described in **Attachment A** for evidence, instrumentalities, and/or fruits of these crimes further described in **Attachment B**.

## II.    PREMISES TO BE SEARCHED

7.      The **SUBJECT PREMISES**, namely, 43063 Weber City Road, Gonzales, Louisiana 70737, a mobile home owned and occupied by **KINCHEN**, her husband, and her two minor children**.** The **SUBJECT PREMISES** is more fully described in Attachment A.

8.      By this affidavit, I am requesting authority to search (A) the entire **SUBJECT PREMISES**, to include the residential dwelling, and all rooms, attics, closed containers, and other places therein, the surrounding grounds, including storage areas, utility sheds, mailboxes, trash containers, and out-buildings attached or detached, under the control of the occupants of the residence; (B) the person of **KINCHEN** for any electronic devices that can connect to the Internet; and (C) any computer and computer media (as such terms are defined herein) located therein where the items specified in **Attachment B** may be found, and to seize all items which constitute evidence, fruits, and instrumentalities of the TARGET OFFENSES, as well as the attempt and conspiracy to violate the foregoing.

## III.    STATUTORY AUTHORITY

9.      This investigation concerns alleged violations of Title 18, United States Code, Section 371, Conspiracy, and Title 18, United States Code, Sections 2251, 2252 and 2252A and 2422(b), the sexual exploitation of children, and activities relating to material involving

the sexual exploitation of children including the production, possession, receipt, and distribution of child pornography, as well as the online enticement of a minor.

    a.    Title 18, United States Code, Section 371, prohibits two or more persons from conspiring to produce, possess, receive, or distribute child pornography, or the online enticement of a minor.

    b.    Title 18, United States Code, Section 2251, in summary prohibits a person from employing, using, persuading, inducing, enticing, or coercing an minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, or for the purpose of transmitting a live visual depiction of such conduct.

    c.    Title 18, United States Code, Section 2252(a), in summary, prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with the intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, including by computer or mail.  Specifically:

    i.    Title 18, United States Code, Section 2252(a)(1) prohibits a person from knowingly transporting or shipping, using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, including by computer or mails, any visual depiction of minors engaging in sexually explicit conduct;

ii.     Title 18, United States Code, Section 2252(a)(2) prohibits a person from knowingly receiving or distributing by any means, including by computer, any visual depiction of minors engaging in sexually explicit conduct, using any means or facility of interstate commerce, or that has been mailed, or shipped or transported in or affecting interstate or foreign commerce.  This subsection also prohibits a person from knowingly reproducing any visual depiction of minors engaging in sexually explicit conduct for distribution, using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or through the mails; and

iii.    Title 18, United States Code, Section 2252(a)(4), prohibits a person from knowingly possessing or accessing with intent to view, one or more books, magazines, periodicals, films, or other materials that contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or have been shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or which were produced using materials which have been mailed, shipped, or transported, by any means, including by computer.

d.     Title 18, United States Code, Section 2252A(a), in summary, prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view, any child pornography (as defined in 18 U.S.C. § 2256) using any means or facility

5

of interstate or foreign commerce, or in or affecting interstate or foreign commerce, including by computer.  Specifically:

i.     Title 18, United States Code, Section 2252A(a)(1) prohibits a person from knowingly mailing, or shipping or transporting, using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography;

ii.    Title 18, United States Code, Section 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed, or shipped or transported using any means or facility of interstate and foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer;

iii.   Title 18, United States Code, Section 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails, or in or affecting interstate or foreign commerce by any means, including by computer; and

iv.    Title 18, United States Code, Section 2252A(a)(5)(B) prohibits a person from knowingly possessing or accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by

6

computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer.

e.      Title 18, United States Code, Section 2422(b), prohibits a person who, using the mail or any facility or means of interstate or foreign commerce, knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so.

## IV.    JURIDICTION

10.    This Court has jurisdiction to issue the requested warrant pursuant to Federal Rule of Criminal Procedure 41 because the **SUBJECT PREMISES** is located within the Middle District of Louisiana.  Specifically, the Court has authority to "issue a warrant to search for and seize a person or property located within the district."  Fed. R. Crim. P. 41(b)(1).

## V.    DEFINITIONS

11.    The following definitions apply to this Affidavit:

a.      "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable

7

from, that of a minor engaged in sexually explicit conduct, or (c) the visual

depiction has been created, adapted, or modified to appear that an identifiable

minor is engaged in sexually explicit conduct).

b.      "Visual depictions" include undeveloped film and videotape, data stored on

computer disk or by electronic means, which is capable of conversion into a

visual image, and data, which is capable of conversion into a visual image, that

has been transmitted by any means, whether or not stored in permanent format.

*See* 18 U.S.C. § 2256(5).

c.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse,

including genital-genital, oral-genital, anal-genital, or oral-anal, whether

between persons of the same or opposite sex; (b) bestiality; (c) masturbation;

(d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or

pubic area of any persons.  *See* 18 U.S.C. § 2256(2).

d.      "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as

"an electronic, magnetic, optical, electrochemical, or other high speed data

processing device performing logical, arithmetic or storage functions, and

includes any data storage facility or communications facility directly related to

or operating in conjunction with such device."

e.      "Computer hardware," as used herein, consists of all equipment, which can

receive, capture, collect, analyze, create, display, convert, store, conceal, or

transmit electronic, magnetic, or similar computer impulses or data.  Computer

hardware includes any data processing devices (including, but not limited to,

central processing units, modems and routers, internal and peripheral storage

medium); peripheral input/output devices (including, but not limited to,

keyboards, printers, video display monitors, and related communications

devices such as cables and connections), as well as any devices, mechanisms,

or parts that can be used to restrict access to computer hardware (including,

but not limited to, physical keys and locks).

f.      "Computer software," as used herein, is digital information, which can be

interpreted by a computer and any of its related components, to direct the way

they work.  Computer software is stored in electronic, magnetic, or other

digital form.  It commonly includes programs to run operating systems,

applications, and utilities.

g.      "Computer passwords and data security devices," as used herein, consist of

information or items designed to restrict access to, or hide, computer software,

documentation, or data.  Data security devices may consist of hardware,

software, or other programming code.  A password (a string of alphanumeric

characters) usually operates a sort of digital key to "unlock" particular data

security devices.  Data security hardware may include encryption devices,

chips, and circuit boards.  Digitally coded data security software may include

programming code that creates "test" keys or "hot" keys, which perform

certain preset security functions when touched.  Data security software or code

may also encrypt, compress, hide, or "booby-trap" protected data to make it

inaccessible or unusable, as well as reverse the progress to restore it.

h.      The "Internet" is a global network of computers and other electronic devices
that communicate with each other.  Due to the structure of the Internet,
connections between devices on the Internet often cross state and international
borders, even when the devices communicating with each other are in the
same state.

i.      "Internet Protocol address" or "IP address" refers to a unique number used by
a computer to access the Internet.  IP addresses can be dynamic, meaning that
the Internet Service Provider (hereinafter "ISP") assigns a unique and different
number to a computer every time it accesses the Internet.  IP addresses might
also be static, if an ISP assigns a user's computer a particular IP address,
which is used each time the computer accesses the Internet.

j.      "Log Files" are records automatically produced by computer programs to
document electronic events that occur on computers.  Computer programs can
record a wide range of events including remote access, file transfers,
logon/logoff times, and system errors. Logs are often named based on the
types of information they contain. For example, web logs contain specific
information about when a website was accessed by remote computers; access
logs list specific information about when a website was accessed from a
remote location; and file transfer logs list detailed information concerning files
that are remotely transferred.

k.       "Storage medium" or "storage media" is any physical object upon which
computer data can be recorded.  Examples include hard disks, RAM, floppy

10

disks, flash memory, CD-ROMs, DVDs, personal digital assistants, multimedia cards, and other magnetic or optical media.

l.      "Cloud storage" is an online storage medium, which allows users to access their files from anywhere using a device connected to the Internet.

m.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, or painting), photographic form (including, but not limited to, microfilm, microfiche, prints, or slides, negatives, videotapes, motion pictures, or photocopies), mechanical form (including, but not limited to, phonograph records, printing, or typing), or electrical, electronic or magnetic media (including, but not limited to, flash drives, hard drives, servers, mobile phones, CDs/DVDs, printer buffers, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## VI.    FACTS SUPPORTING PROBABLE CAUSE

12.    There is probable cause to believe that **KINCHEN**, **DURTSCHI**, and others known and unknown, conspired to commit the TARGET OFFENSES, and the evidence, fruits, and instrumentalities of these crimes will be found at the **SUBJECT PREMISES**.

13.    This investigation stemmed from a complaint received from **KINCHEN**'s husband, identified herein as "B.K.," regarding sexually explicit photos being taken of his minor-stepdaughter by **DURTSCHI**.  Specifically, on August 2, 2021, B.K. called the FBI National Threat Operations Center to report that **KINCHEN** was producing child sexual

11

abuse material of her biological daughter and his stepdaughter, R.K. (hereinafter, "**VICTIM-1**"). Specifically, B.K. reported that **KINCHEN** allowed **DURTSCHI** to take sexually explicit photographs of **VICTIM-1**.

14.    **VICTIM-1** (D.O.B. xx/xx/2008) is a thirteen (13) year old female who resides with **KINCHEN** at the **SUBJECT PREMISES.**

15.    On August 11, 2021, FBI Agents interviewed B.K. at the FBI Baton Rouge Resident Agency. B.K. stated that on or about February or March 2020, **VICTIM-1** began working with an acting/modeling agency after expressing an interest in acting/modeling.

16.     **KINCHEN** began posting pictures of **VICTIM-1** on Instagram to help VICTIM-1's modeling career. **KINCHEN** posted the pictures on **VICTIM-1's** Instagram account.

17.    According to B.K., it was around this time that **KINCHEN** was contacted by J.L., the mother of another minor-model who resides in Denham Springs, Louisiana, in the Middle District. J.L. introduced **KINCHEN** and **VICTIM-1** to **DURTSCHI.**

18.    **KINCHEN** brought **VICTIM-1** to different states to do photoshoots with **DURTSCHI**, including Texas, Louisiana, and Florida. Other minor-models were also present for some of the photoshoots with **VICTIM-1.**

19.    B.K. informed agents that in the Spring of 2021, **KINCHEN** and another mother, P.G., sued **DURTSCHI** for selling photographs of their daughters without their consent. P.G. is the mother of B.S. (hereinafter, "**VICTIM-2**"), a fourteen (14) year old female who resides in Polson, Montana.

20.     On or about August 2021, B.K. began talking with **DURTSCHI** over the application Telegram. Based on my training and experience, Telegram is a free, cross-platform, cloud-based instant messaging (IM) system available for desktop and mobile platforms. The service also provides end-to-end encrypted video calling, VoIP, file sharing and several other features. The servers of Telegram are distributed worldwide but its operational center is based in Dubai in the United Arab Emirates. Various client apps are available for desktop and mobile platforms.  Telegram provides end-to-end encrypted voice and video calls and optional end-to-end encrypted "secret" chats.

21.     In their conversations on Telegram, **DURTSCHI** told B.K. about men who called themselves "sponsors" and who gave money to minor females to help fund their modeling careers.   In exchange for their money, these "sponsors" could request photographs of the minor females from the photoshoots.  In some instances, the sponsor could pay to attend the photoshoots with the minor females.  **DURTSCHI** told B.K. that the "sponsors" paid the minors through the peer-to-peer payment applications Venmo or CashApp.

22.     **DURTSCHI** told B.K. that he did not take nude photographs of any minor females.  However, **DURTSCHI** admitted that he was aware his photographs were purchased by "pedos." **DURTSCHI** told B.K. multiple times that the main buyers of these photographs were pedophiles. **DURTSCHI** said that "megalinks" were the most common way he distributed the photographs of the minors from the photoshoots.

23.     Based on my training and experience, Mega is a cloud storage and file hosting service maintained by Mega Limited based in Auckland, New Zealand.  The service is offered through web browsers and web-based apps for Android, iPhone, and Windows and

can be accessed from traditional computers along with smart phones and tablets.  Users can sign up for free and are provided at least 15GB of cloud storage to save files.  Mega stores these files using end-to-end encryption which prevents anyone, including Mega itself, from accessing or viewing the files or folders without the encryption key.  Files or folders can then be shared with other individuals by creating a link to the file or folder.  The link will contain the encryption key needed to decrypt the file or folder.

24.    After the initial complaint from B.K., I learned of another complaint regarding **VICTIM-1** made to the Louisiana Bureau of Investigation ("LBI").  I obtained the full set of photos taken by **DURTSCHI** of **VICTIM-1** that were received by LBI.  The series consisted of approximately 80 images of **VICTIM-1** in various poses on a bed while wearing a G-string bikini.  Many of the images included **VICTIM-1** with her legs spread apart while lying on the bed. Approximately two of the images included **VICTIM-1** on all fours crawling on the bed. Approximately three of the images were of **VICTIM-1** positioned with her head on a pillow and her butt raised in the air. One of the images showed a close-up of the **VICTIM-1**'s genitals posed in a sexual position on the bed. In this photo, **VICTIM-1**'s genitals were barely covered by the G-string bikini.

### Interview of KINCHEN

25.    Based on the information provided by B.K, I, along with another FBI Agent, interviewed **KINCHEN** at the **SUBJECT PREMISES** on August 18, 2021.

26.    **KINCHEN** said that she and another mother, P.G., filed a civil lawsuit against **DURTSCHI** after learning that **DURTSCHI** sold pictures of **VICTIM-1** and **VICTIM-2** without their knowledge or consent.

14

27.     **KINCHEN** also said that **DURTSCHI** traveled to Louisiana to conduct photoshoots of **VICTIM-1**, including visits to New Orleans on one occasion, and to Baton Rouge on two occasions.

28.     **KINCHEN** stated that **DURTSCHI** shared his photographs of **VICTIM-1** with her using Google Drive. Based on my training and experience, I know that Google Drive is a cloud storage application, allowing the user to store, share, and collaborate on files and folders from any mobile device, tablet, or computer. Google Drive provides encrypted and secure access to your files. Files shared with you are proactively scanned and removed when malware, spam, ransomware, or phishing is detected. Google Drive is cloud-native, which eliminates the need for local files and minimizes risk to your devices.

29.     **DURTSCHI** created a second Google account for **VICTIM-1** because he believed there was not enough storage space on **VICTIM-1's** account.[1] **DURTSCHI** provided **KINCHEN** with the login information for the second Google account.   When **KINCHEN** logged into the account, she saw emails indicating that **DURTSCHI** was selling **VICTIM-1's** photographs and videos, along with other items, such as panties worn by **VICTIM-1**, to multiple different men.   **KINCHEN** identified at least 20 different men to whom **DURTSCHI** sold **VICTIM-1's** photographs, videos and other items.  **DURTSCHI** also posted photographs of **VICTIM-1** through his Instagram accounts, @timelssintx and @timelessintx2 (collectively, "Instagram accounts").

30.     **DURTSCHI** asked to take nude photographs of **VICTIM-1**. Additionally,

---

[1]  The name of the second Google account is known to law enforcement but has intentionally been omitted from this affidavit to protect the identity and privacy of VICTIM-1.

**KINCHEN** was aware **DURTSCHI** told **VICTIM-2** he would rather see her naked out of all the girls he photographed.

31.    In approximately July 2020, **DURTSCHI** asked to take nude photographs of **VICTIM-1. DURTSCHI** became persistent in asking to take nude photographs of **VICTIM-1.**

32.    **VICTIM-1** was last photographed by **DURTSCHI** in October 2020 in Plano, Texas. **KINCHEN** said that during this shoot, **VICTIM-1** was uncomfortable with how **DURTSCHI** was touching her. **DURTSCHI** started to get "handsy" during the shoot.

33.    **KINCHEN** said that individuals wanting to buy **VICTIM-1's** photographs contacted **DURTSCHI. DURTSCHI** then sent the requests to **KINCHEN**, who would choose the photos that would be distributed to those purchasing **VICTIM-1's** photographs.

34.    **KINCHEN** said that **DURTSCHI** sold photographs publicly to "whoever he wanted." **DURTSCHI** sold the photographs through the website www.timelessintx.com. **KINCHEN** reported the website, and it was ultimately shut down.   In addition, **KINCHEN** reported the Instagram account @timelessintx, which was also shut down.

35.    After a photoshoot, **DURTSCHI** gave **VICTIM-1** cash or sent her money through Venmo. **DURTSCHI** told **KINCHEN** that he wanted **VICTIM-1** to "feel good about the shoot." **DURTSCHI** gave **VICTIM-1** approximately $1,000 after one of the photoshoots in Baton Rouge.  In total, **KINCHEN** estimated **DURTSCHI** had given **VICTIM-1** a few thousand dollars.

36.     Recently, a lot of men contacted **KINCHEN** through Instagram to buy photos of **VICTIM-1**. The men offered to buy **VICTIM-1's** photos from **KINCHEN** because **DURTSCHI** was no longer selling her photos.

37.     **KINCHEN** consented to the search of her phone and a forensic extraction was made of the device. **KINCHEN** also provided agents with a copy of evidence stored in a folder on her computer that was entitled "Evidence against Grant."

### Interview of VICTIM-1

38.     On September 28, 2021, agents conducted a child forensic interview with **VICTIM-1.**

39.     **VICTIM-1** stated that she was last photographed by **DURTSCHI** in October 2020.   The photoshoot took place near Dallas, Texas, at an AirBNB rented by **DURTSCHI. VICTIM-1**, her mother, and **DURTSCHI** stayed at the AirBNB together. **DURTSCHI** stayed in one room, while **VICTIM-1** and her mother stayed in another room.

40.     **VICTIM-1** said that she got upset with **DURTSCHI** during the photoshoot because he "touched her butt". She said that **DURTSCHI** moved her to position her for a photo and touched her butt in the process. It made her feel uncomfortable. **DURTSCHI** also untied the string on the bottoms of her swimsuit. **VICTIM-1** caught the suit and tied it back.

41.     **DURTSCHI** asked **VICTIM-1** to take nude photographs. **DURTSCHI** said it was artistic. **VICTIM-1** was not comfortable taking nude photographs.

### Use of Electronic Devices to Facilitate Producing/Selling CSAM

42.     Based on the information received from **KINCHEN, VICTIM-1,** other witnesses and minor victims, there is probable cause to believe that **KINCHEN** and

**DURTSCHI** enticed **VICTIM-1** to take sexually explicit photographs and then sold these photographs to pedophiles for profit.

43.     Agents reviewed the evidence obtained from the forensic analysis of **KINCHEN's** phone. There was another photo of **VICTIM-1** posed at a pool in a black thong bathing suit. **VICTIM-1** was positioned on her knees facing away from the camera with her legs spread apart and the edges of her anus were visible.

44.     Agents also located screenshots on the phone of a conversation with an individual named "Jeremy Smith." Through interviews, analysis of financial records, and law enforcement databases, Agents were able to determine the identity of the individual to be Jeremy Maurer, a registered sex offender. Maurer was convicted of possession of child pornography in July 2016 in Hamilton County, Indiana. The screenshots show a picture that was sent from Maurer of a prepubescent female climbing up a staircase wearing a thong with her legs spread apart and the camera is focused on her butt and the edges of her anus are visible. There is another screenshot from the conversation with Maurer of the same prepubescent female. In this picture, the prepubescent female is wearing an untied, loosely hanging swimsuit bottom. The focus of the image is on the genitals and her pubis is exposed.

45.     The phone contained communications between **KINCHEN, DURTSCHI,** and others via the messaging application Telegram.

46.     In those conversations, **DURTSCHI** admitted to **KINCHEN** that he was a pedophile. **DURTSCHI** stated that his family knew he was a pedophile, and 99% of the people in this industry [teen modeling] were pedophiles.

47.    In one conversation, dated August 17, 2020, **KINCHEN** told another individual, who is believed to be **DURTSCHI,** that she downloaded all of the photos shared by **DURTSCHI** from **VICTIM-1's** Google Drive account to her computer.



**Deleted Account**                                           20:03

Are there any other post type pics you don't have? I shared some. But might have had more. I usually download things so the drive can be emptied for the next batch.



**Hannah Kinchen**                                           20:08

I went through my computer. It looks like I have everything downloaded now.

48.    On August 23, 2020, **KINCHEN** and the same individual, believed to be **DURTSCHI**, discussed ideas for photoshoots and a website for **VICTIM-1.**   During that exchange,  **KINCHEN** sent a photo that she took of **VICTIM-1** with the comment, "she is finally using her lil butt some lol."  **DURTSCHI** asked **KINCHEN** about developing a website because he had "quite a few thirsty dudes."   **KINCHEN** told **DURTSCHI** that she would organize the photos of **VICTIM-1** into folders.



**Deleted Account**                                           21:02

Any direction on website yet? Quite a few thirsty dudes. Lol. That's a good sign

**Hannah Kinchen**                                           21:09

We need a web designer bad. What do we do in the meantime?

**Deleted Account**                                           21:15

We can trial run Telegram to see the interest and start collecting funds. Or just organize the photos so it's all set when it's time. I'd do as many normal as it seems safe to do. No need to have pics never used and many see quantity as at least something desirable.



**Hannah Kinchen**                                           21:18

I can spend this week getting pictures in folders for a trial run. Any that need editing, like her under arms, I'll put in a folder for you and then we can go from there.

19

49.    In the same conversation, **KINCHEN** also told **DURTSCHI** that she had 50 sets of photos "between what you and I have shot so far."



**Hannah Kinchen**    21:55

I have about 50 sets of different outfits between what you and I have shot so far

I don't know if that good or not. She's only been shooting for almost 3 months now. That's not counting customs of course    21:57

50.    In addition, as seen in the examples below, **DURTSCHI** utilized the Instagram accounts @timelessintx and @timelessintx2 to advertise the sexually explicit photographs of minor victims, including photographs of **VICTIM-1.**



106 likes

timelessintx As seen in her live, the cute Dolls bikini with a different sapphire type top of ███ This set is called Sapphire. 174 pics. ███████ #photoset #bikinimodel #bellalynofficial

View 1 comment



**Deleted Account**    22:23

And I have stuff too probably. If it's "customs" what we saw with ███ was post safe angles for website but then they all know it's a thong and come begging for customs.



**Hannah Kinchen**    22:24

She said she's still up for customs. Just not like the blue one.

I can get her to do one more similar though for Tommy    22:24

51.     Potential buyers messaged **DURTSCHI** and purchased "sets" of the minors'
photographs via the Instagram accounts**.  DURTSCHI** also advertised used clothing items of
**VICTIM-1** and other minor-models to sell on the Instagram accounts.

52.     FBI Analysts conducted an analysis of **KINCHEN** and **DURTSCHI's** peer-
to-peer financial transaction accounts, including PayPal, Venmo, and CashApp.

53.     Records of **DURTSCHI's** financial accounts indicated that **DURTSCHI**
received numerous payments, mostly from men.   The comments associated with the
payments sometimes included references to the Instagram accounts as well as the name of
**VICTIM-1**, as seen in the snapshot below taken from one of his PayPal activity logs:

| Date | Description | Amount | Comment |
|---|---|---|---|
| 09-May-21 | Betaling til TimelessinTX for ▮ | ($1,082.34 USD) | |
| 08-May-21 | Betaling til TimelessinTX for ▮ | ($996.60 USD) | |
| 07-May-21 | | $906.60 USD | |
| 07-May-21 | | $897.40 USD | |
| 06-May-21 | Payment to TimelessinTX for invoice | $776.33 USD | |
| 06-May-21 | | $655.26 USD | |
| 06-May-21 | | $533.17 USD | And VICTIM-1 Sport Boutine |
| 06-May-21 | | $450.00 USD | For VICTIM-1 black boutine and VICTIM-1 G String |
| 05-May-21 | | $225.00 USD | |
| 04-May-21 | | $221.07 USD | |
| 04-May-21 | | $125.00 USD | |
| 03-May-21 | | $671.07 USD | VICTIM-2 blue micro and white |
| 03-May-21 | | $425.00 USD | |
| 02-May-21 | | $300.00 USD | |
| 01-May-21 | | $680.61 USD | |
| 01-May-21 | | $559.54 USD | |
| 01-May-21 | | $441.37 USD | Media consultation |
| 01-May-21 | | $221.07 USD | for VICTIM-1 Black Routine |
| 30-Apr-21 | | $125.00 USD | From D▮ @protonmail. com |
| 29-Apr-21 | | $257.00 USD | |
| 26-Apr-21 | | $586.04 USD | |
| 25-Apr-21 | | $364.97 USD | |
| 25-Apr-21 | | $245.77 USD | |
| 25-Apr-21 | | $121.22 USD | |
| 25-Apr-21 | | $120.00 USD | |
| 24-Apr-21 | | $663.22 USD | |
| 24-Apr-21 | | $367.14 USD | VICTIM-2 micro g string set. |
| 24-Apr-21 | | $246.07 USD | VICTIM-2 blue Micro |
| 24-Apr-21 | | $125.00 USD | For VICTIM-2 g-string set |
| 21-Apr-21 | | $365.00 USD | From J▮ @live. se Privat set g string |

54.     Over 70 men issuing payments to **DURTSCHI** were identified based on the
information available.   Of those 70 men, several of the men were convicted sex offenders or
had other related convictions in their criminal history.

21

55.     According to law enforcement records, one individual who paid **DURTSCHI** was previously arrested for Aggravated Sexual Assault of a Child; another individual had an arrest for procuring alcohol for a minor and contributing to the delinquency of a child; two were registered sex offenders, one of which had a prior arrest for child exploitation and possession of child pornography; and finally, one individual had been previously arrested for Kidnapping; Rape Felony/Force/Threat.

56.     Similarly, records of **KINCHEN**'s financial accounts indicated that she was receiving money from **DURTSCHI** along with other identified men who were buying sets from **DURTSCHI.** One of the comment lines in the transactions included "What are you selling? Snap; EVRCLR666."

57.     Finally, the National Center for Missing and Exploited Children ("NCMEC") has received several complaints to its CyberTip line regarding the Instagram accounts for suspected CSAM.

58.     For example, on August 10, 2021, NCMEC received a cybertip from PayPal reporting **DURTSCHI** for purchasing suspected CSAM using his PayPal account on May 22, 2021.

## VI.     PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

59.     On March 7, 2022, a federal search warrant was executed at **DURTSCHI**'s residence, located in Denton County, Texas.

60.     On the same day, I interviewed **DURTSCHI** who admitted to taking the photographs of **VICTIM-1** on the bed in the G-string bikini with a close up of her anus and

vagina. **DURTSCHI** and **KINCHEN** instructed **VICTIM-1** to pose in this position. Those pictures were taken during June or July 2020.

61.     **DURTSCHI** said he took more pictures of **VICTIM-1** in the same pose during their photoshoot in October 2020. He said that he did that pose while **VICTIM-1** was wearing five separate bathing suits. **DURTSCHI** and **KINCHEN** instructed **VICTIM-1** to pose in this position.

62.     **DURTSCHI** gave **KINCHEN** all of the photographs from that photoshoot in October 2020.

63.     Based on evidence reviewed from **KINCHEN's** phone, I noted numerous instances where **KINCHEN** discussed downloading and uploading photographs of **VICTIM-1** to her computer and/or hard drives.

| | Deleted Account | 20:11 |
|---|---|---|
| | The first night suit is up. I had to delete two outfits from the first shoot. Hopefully you downloaded them before. | |
| HK | Hannah Kinchen | 20:38 |
| | I did. I've downloaded everything except for what you just shot. | |
| | Deleted Account | 20:54 |
| | Some guy was asking for heels. Lol. Now he has them | |
| HK | Hannah Kinchen | 20:55 |
| | Probably the same guy the keeps saying we need full length body pictures lol | |
| | Its hard to fit a full length picture into a square 🙈 | 20:55 |

64.    Additionally, while I was at the **SUBJECT PREMISES** during the interview of **KINCHEN,** I observed **KINCHEN's** laptop which contained the pictures and information she had regarding **DURTSCHI** stored on the kitchen table.

## VIII.   TECHNICAL TERMS

65.    As described above and in **Attachment B**, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

66.    ***Probable cause***.  I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based upon my training and experience, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.  In the past, child pornography was produced using cameras and film (either still photography or movies).  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement.  The distribution

of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

b.     The development of computers has radically changed the way that child pornographers obtain, distribute and store their contraband. Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

c.     Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner. Moreover, with the advent, proliferation and widespread use of digital cameras, the images can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device. Digital cameras have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

d.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

e.   The Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

f.   Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography.  The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.  Even in cases where online storage or cloud storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

g.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files.  Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users which have occurred over the Internet.  These logs are

26

commonly referred to as "chat logs."  Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other.  This is often referred to as "chatting," or "instant messaging." Based on my training and experience, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they record communications in transcript form, show the date and time of such communications, and also may show the dates and times when images of child pornography were traded over the Internet.  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded.  Such information is often maintained on a computer for long periods of time until overwritten by other data.

h.       Based on my knowledge, training, and experience, I also know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not

27

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

i.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

j.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

k.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

67.    ***Forensic evidence.***  As further described in **Attachment B**, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is

probable cause to believe that this forensic electronic evidence will be on any storage

medium in the **SUBJECT PREMISES** because:

a.    Data on the storage medium can provide evidence of a file that was once on

the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word

processing file).  Virtual memory paging systems can leave traces of

information on the storage medium that show what tasks and processes were

recently active.  Web browsers, e-mail programs, and chat programs store

configuration information on the storage medium that can reveal information

such as online nicknames and passwords.  Operating systems can record

additional information, such as the attachment of peripherals, the attachment

of USB flash storage devices or other external storage media, and the times the

computer was in use.  Computer file systems can record information about the

dates files were created and the sequence in which they were created, although

this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic

storage media may provide crucial evidence of the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude

the innocent from further suspicion.  In my training and experience,

information stored within a computer or storage media (e.g., registry

information, communications, images and movies, transactional information,

29

records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may

also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

31

about how a computer behaves.  Therefore, contextual information necessary
to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its
use, who used it, and when, sometimes it is necessary to establish that a
particular thing is not present on a storage medium.  For example, the presence
or absence of counter-forensic programs or anti-virus programs (and
associated data) may be relevant to establishing the user's intent.

68.    ***Necessity of seizing or copying entire computers or storage media.***  In most
cases, a thorough search of a premises for information that might be stored on storage media
often requires the seizure of the physical storage media and later off-site review consistent
with the warrant. In lieu of removing storage media from the premises, it is sometimes
possible to make an image copy of storage media.  Imaging is the taking of a complete
electronic picture of the computer's data, including all hidden sectors and deleted files.
Either seizure or imaging is often necessary to ensure the accuracy and completeness of data
recorded on the storage media, and to prevent the loss of the data either from accidental or
intentional destruction.  This is true because of the following:

a.    The time required for an examination.  As noted above, not all evidence takes
the form of documents and files that can be easily viewed on site.  Analyzing
evidence of how a computer has been used, what it has been used for, and who
has used it requires considerable time, and taking that much time on premises
could be unreasonable.  When the user wants to conceal criminal evidence, he
or she often stores it in random order with deceptive file names.  This requires

searching authorities to examine all the stored data to determine whether it is included in the warrant.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge, in a manner that is designed to protect the

integrity of the evidence and to recover hidden, erased, compressed, password

protected, or encrypted files.

c.      Variety of forms of electronic media.  Records sought under this warrant could

be stored in a variety of storage media formats that may require off-site

reviewing with specialized forensic tools.

69.      ***Nature of examination.***  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise

copying storage media that reasonably appear to contain some or all of the evidence

described in the warrant, and would authorize a later review of the media or information

consistent with the warrant.  The later review may require techniques, including but not

limited to computer-assisted scans of the entire medium, that might expose many parts of a

hard drive to human inspection in order to determine whether it is evidence described by the

warrant.

## IX.    <u>CONCLUSION</u>

70.      Based on the foregoing, there is probable cause to believe that federal criminal

statutes cited herein have been violated, and that fruits, evidence, and instrumentalities of

these offenses are located at the residence listed in **Attachment A**.

71.      Therefore, I respectfully request a search warrant be issued by this Court

authorizing the search and seizure of the items listed in **Attachment B**.

72.      Your Affiant is aware that the recovery of data by a computer forensic analyst

takes significant time, much the way recovery of narcotics must later be forensically

evaluated in a lab, digital evidence will also undergo a similar process.  For this reason, the

"return" inventory will contain a list of only the tangible items recovered. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

73.    This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## X.    REQUEST FOR SEALING

74.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding

forums.  Premature disclosure of the contents of this affidavit and related documents may

have a significant and negative impact on the continuing investigation and may severely

jeopardize its effectiveness.

Respectfully submitted,

Stephanie Bobo
Special Agent
Federal Bureau of Investigation

**Affidavit submitted by email/.pdf and attested to me as true and accurate by telephone consistent with Federal Rules of Criminal Procedure 4.1 and 41(d)(3) on March ___11___, 2022.**

ERIN WILDER-DOOMES, JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

36

## <u>ATTACHMENT A</u>

The property to be searched is **43063 Weber City Road, Gonzales, Louisiana 70737**, as well as any electronic devices or storage mediums found therein.  The **SUBJECT PREMISES** is further described as follows:

The **SUBJECT PREMISES** is a mobile home located in Ascension Parish, in the Middle District of Louisiana.  The **SUBJECT PREMISES** is owned and occupied by **KINCHEN,** her husband, B.K., and her two minor children.

The search of the **SUBJECT PREMISES** shall include all rooms, extend into desks, cabinets, safes, briefcases, purses, trash receptacles, electronic storage devices and other storage locations with the **SUBJECT PREMISES**, such as any sheds or storage structures located on the property of the **SUBJECT PREMISES,** in which items in attached **Attachment B** may be found.

The following are photographs of the **SUBJECT PREMISES**:

Front View:                                          Front Right View:

 

Additional Front Right View:



## **ATTACHMENT B**

## **DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of a crime, or property designed or intended for use, or which is or has been used, as the means of committing violations of 18 U.S.C. §§ 371, 2251, 2252, 2252A, and 2422(b)  by **KINCHEN**:

1.      Computer(s), computer hardware, computer software (including programs to run operating systems and applications such as word and image processing, communications programs, instant messaging, and peer-to-peer software), storage media, computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, or information pertaining to an interest in child pornography.

2.      Electronic devices, including computer equipment and mobile devices, that can connect to the Internet and record pictures or video.

3.      In electronic or digital format, all originals, computer files, records, copies, and negatives of child pornography or visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256.

4.    Notes, documents, information, records, or correspondence, in electronic or digital format (including letters, diaries, word processing documents, address books, email messages, chat logs and electronic messages, other digital data files, and web cache information):

      a.    pertaining to or concerning the possession, receipt, transmission, distribution, or production of child pornography or to the possession, receipt, transmission, distribution, or production of visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256, by **KINCHEN**;

      b.    identifying the person transmitting, through interstate or foreign commerce, by any means, any child pornography or any visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256;

      c.    containing names or lists of names and addresses of individuals who have been contacted by **KINCHEN** by use of the computer(s) or by other means for the purpose of distributing, receiving, or producing child pornography or visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256;

      d.    reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256;

3

e.      concerning communications between **KINCHEN** and other individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography;

f.      concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members;

g.      concerning online storage, cloud storage, or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show a connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage; and

h.      pertaining to the preparation, purchase, and acquisition of names or lists of names (for example, address books, mailing lists, supplier lists) to be used in connection with the purchase, sale, trade, or transmission through interstate or foreign commerce by any means any child pornography or any visual depiction of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256.

5.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records

4

or information that is otherwise called for by this warrant (hereinafter, the "Seized Computer"):

     a.     evidence of who used, owned, or controlled the Seized Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

     b.     evidence of software that would allow others to control the Seized Computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.     evidence of the lack of such malicious software;

     d.     evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

     e.     evidence of the attachment to the Seized Computer of other storage devices or similar containers for electronic evidence;

     f.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Seized Computer;

     g.     evidence of the times the Seized Computer was used;

5

h.      passwords, encryption keys, and other access devices that may be

        necessary to access the Seized Computer;

i.      documentation and manuals that may be necessary to access the Seized

        Computer or to conduct a forensic examination of the Seized

        Computer;

j.      records of or information about Internet Protocol addresses used by the

        Seized Computer;

k.      records of or information about the Seized Computer's Internet activity,

        including firewall logs, caches, browser history and cookies,

        "bookmarked" or "favorite" web pages, search terms that the user

        entered into any Internet search engine, and records of user-typed web

        addresses;

l.      contextual information necessary to understand the evidence described

        in this attachment.

6.      *Definitions*.  As used throughout this attachment:

a.      The term "computer" includes all types of electronic, magnetic, optical,

        electrochemical, or other high-speed data processing devices

        performing logical, arithmetic, or storage functions.  Examples include

        desktop computers, notebook computers, mobile phones, tablets, server

        computers, and network hardware.

b.    The term "storage medium" or "storage media" includes any physical

object upon which computer data can be recorded.  Examples include

hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other

magnetic or optical media.

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☑ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Louisiana

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  22-mj -15 |
| The Property Located at 43063 Weber City Road, | ) | |
| Gonzales, Louisiana 70737 | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Middle _____ District of _____ Louisiana _____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT "A"

This Court possesses the authority to issue this warrant under 18 U.S.C. Sections 2703(c)(1)(A) and 2711(3)(A)(i) and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT "B"

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 24, 2022 _____ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Judge Erin Wilder-Doomes _____ .
                                                                                            *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____ 3/11/2022 at 9:10 a.m. _____         _____ *Erin Wilder-Doomes* _____
                                                                                            *Judge's signature*

City and state:  _____ Baton Rouge, Louisiana _____         Erin Wilder-Doomes, U.S. Magistrate Judge
                                                                                            *Printed name and title*

**ATTACHMENT A**

The property to be searched is **43063 Weber City Road, Gonzales, Louisiana 70737**, as well as any electronic devices or storage mediums found therein.  The **SUBJECT PREMISES** is further described as follows:

The **SUBJECT PREMISES** is a mobile home located in Ascension Parish, in the Middle District of Louisiana.  The **SUBJECT PREMISES** is owned and occupied by **KINCHEN,** her husband, B.K., and her two minor children.

The search of the **SUBJECT PREMISES** shall include all rooms, extend into desks, cabinets, safes, briefcases, purses, trash receptacles, electronic storage devices and other storage locations with the **SUBJECT PREMISES**, such as any sheds or storage structures located on the property of the **SUBJECT PREMISES,** in which items in attached **Attachment B** may be found.

The following are photographs of the **SUBJECT PREMISES**:

Front View:                                         Front Right View:



Additional Front Right View:



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of a crime, or property designed or intended for use, or which is or has been used, as the means of committing violations of 18 U.S.C. §§ 371, 2251, 2252, 2252A, and 2422(b)  by **KINCHEN**:

1.      Computer(s), computer hardware, computer software (including programs to run operating systems and applications such as word and image processing, communications programs, instant messaging, and peer-to-peer software), storage media, computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, or information pertaining to an interest in child pornography.

2.      Electronic devices, including computer equipment and mobile devices, that can connect to the Internet and record pictures or video.

3.      In electronic or digital format, all originals, computer files, records, copies, and negatives of child pornography or visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256.

2

4.      Notes, documents, information, records, or correspondence, in electronic or digital format (including letters, diaries, word processing documents, address books, email messages, chat logs and electronic messages, other digital data files, and web cache information):

a.      pertaining to or concerning the possession, receipt, transmission, distribution, or production of child pornography or to the possession, receipt, transmission, distribution, or production of visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256, by **KINCHEN**;

b.      identifying the person transmitting, through interstate or foreign commerce, by any means, any child pornography or any visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256;

c.      containing names or lists of names and addresses of individuals who have been contacted by **KINCHEN** by use of the computer(s) or by other means for the purpose of distributing, receiving, or producing child pornography or visual depictions of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256;

d.      reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256;

3

e.     concerning communications between **KINCHEN** and other individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography;

f.     concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members;

g.     concerning online storage, cloud storage, or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show a connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage; and

h.     pertaining to the preparation, purchase, and acquisition of names or lists of names (for example, address books, mailing lists, supplier lists) to be used in connection with the purchase, sale, trade, or transmission through interstate or foreign commerce by any means any child pornography or any visual depiction of minors engaged in sexually explicit conduct, as such terms are defined in 18 U.S.C. § 2256.

5.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records

4

or information that is otherwise called for by this warrant (hereinafter, the "Seized Computer"):

a.      evidence of who used, owned, or controlled the Seized Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the Seized Computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.      evidence of the attachment to the Seized Computer of other storage devices or similar containers for electronic evidence;

f.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Seized Computer;

g.      evidence of the times the Seized Computer was used;

5

h.      passwords, encryption keys, and other access devices that may be
        necessary to access the Seized Computer;

i.      documentation and manuals that may be necessary to access the Seized
        Computer or to conduct a forensic examination of the Seized
        Computer;

j.      records of or information about Internet Protocol addresses used by the
        Seized Computer;

k.      records of or information about the Seized Computer's Internet activity,
        including firewall logs, caches, browser history and cookies,
        "bookmarked" or "favorite" web pages, search terms that the user
        entered into any Internet search engine, and records of user-typed web
        addresses;

l.      contextual information necessary to understand the evidence described
        in this attachment.

6.   *Definitions*.  As used throughout this attachment:

a.      The term "computer" includes all types of electronic, magnetic, optical,
        electrochemical, or other high-speed data processing devices
        performing logical, arithmetic, or storage functions.  Examples include
        desktop computers, notebook computers, mobile phones, tablets, server
        computers, and network hardware.

6

b.      The term "storage medium" or "storage media" includes any physical

object upon which computer data can be recorded.  Examples include

hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other

magnetic or optical media.

7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF LOUISIANA**

IN THE MATTER OF THE SEARCH    :
OF THE PROPERTY LOCATED    :    22-mj-15
AT 43063 WEBER CITY ROAD,    :
GONZALES, LOUISIANA 70737    :    **(UNDER SEAL)**

## MOTION TO SEAL APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT, SEARCH WARRANT, AND SEARCH WARRANT RETURN

NOW INTO COURT comes the undersigned Assistant United States Attorney who represents that:

The United States moves at this time to seal the above captioned application and affidavit for a search warrant, the search warrant, and the search warrant return for the following reason:

Publication of this application and affidavit for search warrant, the search warrant, and the search warrant return at this time would prejudice an ongoing federal criminal investigation.

WHEREFORE, the United States prays that the application and affidavit for the search warrant, the search warrant, the search warrant return, and this Motion and Order to Seal be granted.

UNITED STATES OF AMERICA, by

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY


/s/ Kristen Lundin Craig
Kristen Lundin Craig, LBN 32565
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: kristen.craig@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF LOUISIANA**

IN THE MATTER OF THE SEARCH      :
OF THE PROPERTY LOCATED      :      22-mj-15
AT 43063 WEBER CITY ROAD,      :
GONZALES, LOUISIANA 70737      :      **(UNDER SEAL)**

**O R D E R**

Considering the foregoing,

IT IS HEREBY ORDERED, that the application and affidavit in support of a search warrant, the search warrant, and the search warrant return in this matter be sealed until further orders from the Court,

IT IS FURTHER ORDERED that this Motion and Order be sealed; however, nothing in this Order shall preclude transmission of this Order to the United States Attorney's Office or representatives of the U.S. Department of Justice, Federal Bureau of Investigation.

Baton Rouge, Louisiana, this   11th   day of March, 2022.

 

_____
THE HONORABLE ERIN WILDER-DOOMES
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF LOUISIANA